UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CONSTANTINE SIMAKAS,

       Plaintiff,

v.                                                                                        CIVIL CASE NO. 05-73691
                                                      HON. MARIANNE O. BATTANI

UNUM PROVIDENT CORP.,

       Defendant.

_____/

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION
FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND GRANTING
DEFENDANT'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

**I.    INTRODUCTION**

Before the Court are Plaintiff's and Defendant's Cross Motions for Judgment on the Administrative Record (Doc. ##9 & 10). Plaintiff filed suit challenging Defendant's denial of his application for Long-Term Disability ("LTD") Benefits. Defendant denied Plaintiff benefits after it concluded that he was not physically disabled to the extent that he could not work at a job for which he is qualified by education, experience, restrictions, and available wage. Plaintiff asserts that he is physically disabled by coronary artery disease and hypertension.

**II.    STATEMENT OF FACTS**

Constantine Simakas is a fifty-four year-old male formerly employed by Ricardo Inc. as a fabricator. In December 2000, he underwent triple bypass surgery. Simakas filed a claim for benefits in December 2000, under a prior plan administered by Paul Revere Life Insurance Company. Admin. Rec. at PRLCL00013-16. Simakas received benefits from Paul Revere through October 1, 2001, when he was released to return to work. Admin. Rec. at PRLCL00444.

Simakas last worked on January 7, 2002.  Admin. Rec. at UACL00037.  Two days later, he submitted a claim for disability benefits to UNUM, based upon a doctor's note on that relieved him from work until further notice due to his history of bypass surgery and hypertension.  Admin. Rec. at UACL00036- 37.

Dr. Thomas Hashway, Jr., M.D., board-certified in Internal Medicine and Cardiovascular Diseases, ended a medical review of Simakas's medical records on March 22, 2002.  He concluded that the restrictions and limitations imposed on Simakas "appear[ed] to be supported beyond 1/27/02, pending psychiatric review of the file and pending some idea of resolution or status of exertional dyspnea in future progress notes."  Admin. Rec. at UACL0006.

On March 26, 2002 a UNUM clinical psychiatric consultant, Stan Vogel, wrote that "the claimant appears to have experienced anxiety and stress which it is felt relates to his HTN [hypertension]," but that "it is not felt that there are clear restrictions and limitations based on the information available, though such as are possible."  Admin. Rec. at UACL00030.  The next day, a clinical psychologist, Dr. Thomas Pendergrass, Ph.D., reviewed Simakas's medical records and concluded that the "available data suggests the presence of an anxiety disorder, but the extent of functional limitation associated with this is unclear" because the "anxiety has not been a focus of active evaluation or treatment."  Admin. Rec. at UACL0002.  UNUM approved Simakas's claim for STD benefits through the end of his benefit period.  Admin. Rec. at UACL0001.  On February 8, 2002, UNUM notified Simakas that he would have to submit various medical records if he were to receive benefits after January 2002.  Admin. Rec. at UACL00071-72.  On February 21, 2002, UNUM wrote to Simakas to confirm receipt of his LTD claim.  Admin. Rec. at UACL00057.

On June 20, 2002, UNUM denied Simakas's claim for benefits, explaining to him that his attending physician, Dr. Savas, indicated that he had not been treated since a March 7, 2002, appointment, and noted that "[o]n June 6, 2002, you contacted our office and notified us that Dr. Savas had not treated you since [March 7, 2002] . . . , nor have you sought treatment from other providers." Admin. Rec. at UACL00145-148. UNUM also explained Simakas's right to appeal that denial. In response, Simakas submitted updated medical records.

UNUM's cardiology consultant, Dr. Hashway, reviewed Simakas's updated medical records on July 23, 2002, and concluded that as of April 30, 2002, the "claimant appears capable of medium exertional occupational activities," but he should do "no sustained heavy exertion." Admin. Rec. at UACL00159. Simakas's occupational job description said the "employee must regularly lift and/or move up to 10 pounds and occasionally lift and/or more up to 100 pounds Admin. Rec. at UACL00164. Therefore, on July 26, 2002, UNUM determined that Simakas's condition "would preclude [him] from performing his occupation" and re-opened his claim. Admin. Rec. at UACL00172. UNUM formally notified Simakas of the decision on July 29, 2002. Admin. Rec. at UACL00174.

Between August 2 and August 5, 2002, Simakas was admitted to Garden City Hospital after he suffered another heart attack. Admin. Rec. at UACL00200-204.

On October 18, 2003, UNUM informed Simakas that it was beginning its evaluation of his eligibility for benefits beyond twenty four months because the Plan defined a claimant as disabled after twenty four months only if they are "unable to perform the duties of any gainful occupation for which [they] are reasonably fitted by education, training or experience." Admin. Rec. at UACL00309-310, Admin. Rec. at UACL00838 ("[a]fter 24 months of payments, you are

3

disabled when UNUM determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training, or experience").

On May 14, 2004, UNUM had Dr. Hashway review Simakas's entire medical history. After reviewing his records, Dr. Hashway gave the following written opinion on May 28, 2004:

> I commented on this file on 3/22/02 and 7/23/02. Since then, the claimant has undergone another mechanical intervention in 2003. Since that intervention, his course has been stable, although he has had some atypical heart discomfort. There is no formal functional testing in the file. Dyspnea is no longer a symptom. His left ventricular function is normal, as measured by ejection fraction. . . . .
>
> In response to your questions, the claimant can sit continuously; he can stand and walk at intervals, but not continuously; he can exert up to 20 pounds of force occasionally and up to 10 pounds frequently to move objects. [Restrictions and limitations] of no sustained exertion over 20 pounds are supported. This opinion is based on the stability of his clinical course since 2003, the absence of evidence of residual provocable myocardial ischemia and his adequate left ventricular function. He has reached the recovery period expected after his last mechanical intervention in 2003.

Admin. Rec. at UACL00565.

On June 2, 2004, Lucy Crider, a Senior Vocational Rehabilitation Consultant for UNUM, completed a Vocational Assessment. Admin. Rec. at UACL00579-80. She concluded that considering Simakas's work history, education, restrictions and limitations, and $14.12/hr gainful wage requirement, that he could perform work as an experimental welder, semiconductor bonder, and repair order clerk. Admin. Rec. at UACL00579-80.

On June 14, 2004, UNUM informed Simakas's employer and Simakas that he did not continue to qualify for LTD benefits. Admin. Rec. at UACL00609-11 and 612-15. UNUM explained in detail that his medical records, which were reviewed by a board-certified cardiologist, established that he could stand and walk at intervals, could exert 20 pounds of force

4

occasionally and 10 pounds frequently, that his clinical course since 2003 was stable, that there was no evidence of residual provocable myocardial ischemia, and that he had adequate left ventricular function.  Admin. Rec. UACL00613.  UNUM also explained to him that based upon its vocational assessment, he could engage in gainful work based upon his education and training Id.  Specifically, UNUM wrote: "In conclusion, restrictions and limitations are not supported that would preclude you from performing the material and substantial duties of any gainful occupation.  As a result, we are unable to continue paying benefits beyond June 10, 2004 and your LTD claim has been closed."  Admin. Rec. at UACL00613.  UNUM also told Simakas how to appeal that decision.

On June 30, 2004, Simakas sent a letter indicating his intention to appeal the denial Admin. Rec. at UACL00624.  On July 6, 2004, Simakas sent a letter in which he informed UNUM that he suffered yet another heart attack on July 3, 2004, and was transported from Garden City Hospital to Providence Hospital for treatment.  Admin. Rec. at UACL00625.  On July 13, 2004, UNUM told Simakas that it had not received any additional medical information regarding his appeal since his July 6, 2004, telefax, and also advised him that it could not request medical records for appeal purposes and that it would be his responsibility to submit any information that he wished for UNUM to include in the appeal review.  Admin. Rec. at UACL00633.

UNUM referred Simakas's appeal for further medical review. On September 1, 2004, Simakas's medical records were reviewed by Dr. Cortas T. Lambrew, M.D.[1]  After reviewing all of Simakas's medical records, Dr. Lambrew reported:

> All of Dr. Savas' notes reflect difficulty controlling blood pressure because of lack of compliance with medication, taking the wrong meds, not taking them, dietary indiscretion, lack of exercise, and difficulty controlling lipids for the same reasons.  He has refused to take a statin.  He missed office visits.  She described significant anxiety, a depressed mood, lack of motivation.  However, through most of late 2003 and 2004, his blood pressure has been fairly well controlled.  The status of his lipid control is not clear.  There is no evidence that he has been treated with amxiolytics or antidepressants or counseled, despite his lack of motivation, lack of compliance, expressed anxiety, [or] concern over being poisoned.
> . . . .
> While he is at continual high risk for recurrent cardiac events, despite Dr. Savas' efforts, and in large part because of his poor compliance, there is no evidence to support a functional limitation that would preclude exercise, as recommended by Dr. Savas, or an appropriate level of sustained work.  The New York Heart Association classification is a functional classification, and the records do not document any limitation of activity as a result of symptoms.  Other than the occurrence of the acute events, there are no reported symptoms at rest which would support a Class 4 classification.  Furthermore, there is no evidence that recurrent cardiac events are more common on than off the job that would support his not working at an appropriate level, despite his continued risk, and given the stability of his functional cardiac status between events.

Admin. Rec. at UACL00874-75.  He concluded that although Simakas was at continued high risk for recurrent cardiac events, given his underlying disease, and lack of compliance, untreated anxiety, and depression, he possessed the functional capacity to sustain work at a sedentary or light level.  Admin. Rec. at UACL00875.

---

[1]  Dr. Lambrew is a board-certified cardiologist, and is Director Emeritus and Senior Consultant in Cardiology at the Maine Medical Center.  He is also Professor of Medicine at the University of Vermont College of Medicine.  Admin. Rec. at UACL00875).

UNUM sent Simakas a letter on September 30, 2001, denying his appeal. Admin. Rec. at UACL00889-95. UNUM explained in detail the reasons for its decision:

> It was noted that through most of Dr. Savas' notes in 2003 and 2004, that you denied experiencing chest pain, or you described chest paid which she did not consider to be cardiac, and you had no complaints of dyspnea, orthopnea or paroxysmal dyspnea. Also no examination record showed any evidence of jugular venous distention, rales or a gallop as a sign of failure.
>
> It was further noted that all of Dr. Savas' notes reflected difficulty in controlling your blood pressure and your lipids because of your lack of compliance with medication, taking the wrong medications or failing to take your medications, dietary indiscretion, lack of exercise, and missing office visit appointments.
>
> However, through most of late 2003 and 2004, your blood pressures have been fairly well controlled based on the documentation that was provided for our review, but the status of lipid control was unclear. There was no record that you have been treated with either anxiolytics or antidepressants, or counseling despite your reported lack of motivation, lack of compliance, and expressed anxiety. There was also a report that you were concerned over having been poisoned at work, but no further detail was documented in this regard.
>
> Based on the medical documentation that has been provided, you have had 2 myocardial infarctions, occurring on July 1, 2003 and July 3, 2004, following your coronary artery bypass surgery on December 15, 2000. Between these events, it was documented that you have remained fairly well compensated in terms of ischemic and hear failure, with some atypical chest pain, and difficult to control blood pressure and lipids because of poor compliance. Based on the documentation provided, your primary complaints have been related to anxiety and depression; however, there was no record that you have been referred for counseling or received treatments for this.
>
> While the submitted information does not support that you are at continued high risk of future events despite Dr. Savas' treatment efforts, in large part because of your poor compliance, there is no evidence to support a functional limitation that would preclude exercise as was recommended by Dr. Savas, or preclude you from performing an appropriate level of sustained work.
>
> Dr. Savas reported that you have a Class 4 functional classification under the New York Heart Association Classification system. However, your medical records do not document any limitation of activity as a result of symptoms. Other than the occurrence of the acute events December 11, 2000, July 1, 2003 and July 4, 2004,

there are no documented symptoms at rest which would support an American Heart Association Class 4 function classification.

Furthermore, there is no evidence that recurrent cardiac events are more common on than off the job that would support your not working at an appropriate level despite your continued risk given the stability of your functional cardiac status between the cardiac events. It was determined that the submitted medical documentation failed to substantiate a lack of functional capacity between April 2002 and the infarct on July 1, 2003, and failed to substantiate a lack of functional capacity for sustained work at a sedentary or light level following an 8 week recovery period from the infarct on July 1, 2003 (reasonable recovery period ending August 27, 2003) and the infarct on July 3, 2004 (reasonable recovery period ending August 29, 2004) . . . .

Under the Policy's provisions, the definition of disability for Long Term Disability coverage changes after you have received disability benefits for 24 months. At that time, the submitted proof of claim must substantiate that you are unable to perform each of the material duties of any gainful occupation for which you are reasonably fitted, based on training, education or experience.

Since your Long Term Disability benefits began on April 8, 2002, as of April 9, 2004, the definition of disability applicable to your claim required that your condition result in medical restrictions and/or limitations that would prevent you from performing any gainful occupation.

Long Term Disability benefits were paid on your claim to the date of June 10, 2004, at which the claim investigation was completed and it was found that your clinical course had been stable since July of 2003 and the submitted proof of claim failed to support functional restrictions or limitations that would preclude you from performing the material and substantial duties of any gainful occupation for which you are reasonably fitted by training, education and experience. As such, the claim terminated accordingly.

Admin. Rec. at UACL00893-95.

### III. STANDARD OF REVIEW

The Sixth Circuit has held that resolving ERISA actions challenging a denial of benefits on motions for summary judgment is improper. <u>Wilkins v Baptist Healthcare Sys., Inc.</u>, 150 F.3d 609 (6th Cir. 1998). Rather, courts are "to conduct a 'de novo' or 'arbitrary and capricious review' based solely upon the administrative record and render 'findings of fact' and

'conclusions of law' accordingly." Id., at 618-19.  In so doing, the district court is "confined to the record that was before the Plan Administrator.  See Perry v. Simplicity Engineering, 900 F.2d 963, 966 (6th Cir. 1990); see also Rowan, 119 F.3d at 437." Id. at 615.

"In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed.2d 80 (1989), the Supreme Court stated that an administrator's decision to deny benefits is reviewed under a *de novo* standard unless the plan provides the administrator with 'discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" Hoover v. Provident Life and Acc. Ins. Co., 290 F.3d 801, 807 (6th Cir. 2002).  A plan administrator's decision will be upheld under the deferential arbitrary and capricious standard if that decision is "rational in light of the plan's provisions."  University Hosp. v. Emerson Elec. Co., 202 F.3d 839, 846 (6th Cir. 2000).  "[W]hen it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious."  Davis v. Kentucky Fin. Cos. Retirement Plan, 887 F.2d 689, 693 (6th Cir. 1989).  However, "discretion is not an all-or-nothing proposition, such that a plan can give an administrator discretion with respect to some decisions but not others."  Williams v. Int'l Paper Co., 227 F.3d 706, 711 (6th Cir. 2000).  "[E]ach plan must be read in its entirety and language claimed to create the required degree of discretion must be examined in context."  Id.  "Thus, . . . application of the highly deferential arbitrary and capricious standard of review is appropriate only when the benefit plan gives the fiduciary or administrator discretionary authority to determine eligibility for benefits." Miller v. Metro. Life Ins. Co., 925 F.2d 979, 983 (6th Cir. 1991).  Likewise, if the plan gives the fiduciary discretionary authority to construe the terms of the plan, then the arbitrary and capricious standard of review will be applied to that decision.  See Williams, 227 F.3d at 711.

Both parties agree that the plan granted UNUM discretion to both determine eligibility and to interpret the terms and provisions of the plan, therefore, the Court will apply the arbitrary and capricious standard of review to all of UNUM's decisions.

**IV.    ANALYSIS**

Plaintiff asserts UNUM's decision to deny LTD benefits was arbitrary and capricious because it intentionally ignored his treating physicians' opinions and a finding of the Social Security Administration, because the objective medical evidence supports a disability finding, and because there is no valid medical basis to support its decision.

"Generally, when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision." McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 169 (6th Cir. 2003)(footnote omitted).  Moreover, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003).  The Court is not persuaded by Plaintiff's arguments that the Supreme Court's decision in Nord is over-broad and inconsistent with the legislative intent of ERISA, and therefore, will not grant Dr. Savas's opinion any greater weight than it is due.

Likewise, the record evidence does not support Plaintiff's assertion that Defendant's reviewing physician ignored Plaintiff's treating physicians' opinions.  To the contrary, many of

Defendant's written communications specifically reference records supplied by Plaintiff's treating physicians, and in particular, Dr. Savas's prescribed course of treatment. Moreover, Defendant is not required to provide an explanation for crediting "reliable evidence that conflicts with a treating physician's evaluation." Nord, 538 U.S. at 834.

Next, "[a] federal court is to focus on the evidence before the trustees at the time of their final decision and is not to hold a *de novo* factual hearing on the question of the applicant's eligibility." Id. The Social Security Administration's (SSA) decision was not present in the record, nor had the SSA even made a decision at the time Defendant denied Plaintiff benefits. Therefore, the Court will not consider the SSA's decision when determining whether Defendant's decision was arbitrary and capricious.

Nevertheless, "the highly deferential standard of review applicable in this case does not automatically mandate adherence to" the administrator's decision. McDonald, 347 F.3d at 172. The district court is obligated "to review the administrative record in order to determine whether the plan administrator acted arbitrarily and capriciously in making ERISA benefits determinations. This obligation inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues." Id. In this case, upon review of the quality and quantity of the record evidence, "the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision." McDonald, 347 F.3d 161, 169 (6th Cir. 2003). Thus, contrary to Plaintiff's assertion that there is no valid medical basis to support its decision, Defendant's decision was based upon a review of his most recent records by two board-certified cardiologists and a clinical psychologist, as well as

11

examinations by a psychiatric consultant and a vocational rehabilitation consultant. Nor can the Court find that, based upon the evidence, Defendant failed to offer a reasoned explanation.

Finally, although it may be true that the medical evidence would easily support a decision to grant benefits, and although to the layman it would appear obvious that Plaintiff is unable to work, those are not the standards by which the Court must assess Defendant's decision. Rather, the Court must determine if, based on the quality and quantity of review, Defendant's decision to deny benefits was arbitrary and capricious as set forth in the law. Defendant engaged two cardiologists and a psychologist to conduct multiple reviews of Plaintiff's updated medical records, as well as a psychiatric exam and vocational assessment. Based on the quality and quantity of the records they reviewed, the Court cannot disregard the medical opinions of Defendant's doctors that Plaintiff is able to sustain a certain level of work for which he is qualified.

In light of the preceding analysis, the Court finds that Defendant did not act arbitrarily and capriciously and that its decision denying long-term disability benefits to Simakas must be AFFIRMED.

## V. CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Judgment on the Administrative Record is **DENIED.** It is **FURTHER ORDERED** that Defendant's Motion for Judgment on the Administrative Record is **GRANTED.**

**IT IS SO ORDERED.**

s/Marianne O. Battani
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE

DATED: **April 5, 2007**

## CERTIFICATE OF SERVICE

Copies of this Order were served upon counsel of record on this date by ordinary mail and/or electronic filing.

s/Bernadette M. Thebolt

DEPUTY CLERK